The NATIONAL LAMPOON, INC., Plaintiff,

v.

AMERICAN BROADCASTING COMPANIES, INC., et al., Defendants.

No. 74 Civ. 646.

United States District Court, S. D. New York.

April 1, 1974.

Coudert Bros. by Gordon T. King, New York City, for defendants.

Botein, Hays, Sklar & Herzberg by Harry I. Rand, New York City, for plaintiff.

## FINDINGS AND CONCLUSIONS

BRIEANT, District Judge.

Plaintiff filed its complaint in this action on February 7, 1974, seeking a permanent injunction against defendants' use of the word "Lampoon," alone or in combination with other words, (1) as a title for a "pilot" television program of humor and entertainment, presently scheduled to be telecast on April 5, 1974 by defendant American Broadcasting Companies, Inc. (hereinafter "ABC"), and also (2) to enjoin use of the word should ABC decide to furnish the program to its network affiliates as a series for the 1974–75 season, and thereafter.

Plaintiff asserts causes of action for threatened infringement of its trademark "National Lampoon" under 15 U. S.C. § 1114; for misrepresentation under 15 U.S.C. § 1125(a), and for unfair competition under New York State law.

This Court has subject matter jurisdiction of the federal claims, pursuant to 15 U.S.C. § 1121 and 28 U.S.C. § 1338(a) and (b), and pendent jurisdiction of the State claim.

By notice dated February 7, 1974, plaintiff moved for a preliminary injunction pursuant to Rule 65, F.R.Civ.P. This Court advanced and consolidated the trial of the action on the merits with the hearing of the application, pursuant to Rule 65(a)(2), F.R.Civ.P. Trial commenced on March 4, 1974, was continued on March 5th and on March 7th and concluded on March 8th. Briefs and post-trial memoranda have been received and considered and the issues were fully submitted on March 25, 1974.

Plaintiff, a New York corporation, is a subsidiary of Twenty-First Century Communications, Inc. (hereinafter "Twenty-First Century"), also a New York corporation. Defendant ABC is a New York corporation; defendant George Schlatter Enterprises, Inc. (hereinafter "Enterprises") is a California corporation. Mr. George Schlatter (hereinafter "Schlatter") is a California resident and the principal of Enterprises.

*Plaintiff's Activities*

Since April 1970, National Lampoon, Inc. (hereinafter "National Lampoon") has published a magazine entitled "National Lampoon" (hereinafter "Lampoon"). A typical issue of the magazine is comprised of various kinds of materials, including photographs, cartoons, articles, regular columns, all intended to be humorous, and of a nature irreverent, disrespectful, and even offensive. The materials intend to satirize and ridicule various subjects, topics, issues, current events and related aspects of American life.

Generally, each issue of Lampoon is devoted to the incongruities of a single theme, *e. g.*, professional sports (November 1973 issue), strange beliefs (August 1973 issue), racial or religious prejudice (April 1973 issue), death (January 1973 issue), sexual frustration (February 1973 issue), strange sex (February 1974 issue).

The United States Patent Office registered "National Lampoon" as a trademark for magazines on February 2, 1971, Registration No. 907,211.

A magazine known as "Harvard Lampoon", which over the years has also referred to itself simply as "Lampoon", as does plaintiff, was founded in 1876 by undergraduates at Harvard College. It began as a simple magazine of wit and humor of that age, and in recent times has engaged in issuing parodies of other nationally known magazines such as Time, Cosmopolitan, Life, Playboy and Esquire.

The persons who founded National Lampoon were graduates of Harvard College who had worked together as staff members of the Harvard Lampoon. Unwilling to leave their childhood days

behind, they came to New York as a group, started a magazine, and made good. They in effect took the Harvard Lampoon public.

On October 8, 1969, plaintiff entered into an agreement with Harvard Lampoon, Inc., which, with minor modifications, remains in effect. National Lampoon agreed thereby to pay royalties of 2% of the net sales price of the magazine to Harvard Lampoon. The Harvard group agreed, subject to certain terms and conditions, that plaintiff would have "the right to use the name and trademark (if any) of 'Lampoon' as the name of and tradename and trademark for and in connection with any magazine or other periodical which [it] may hereafter publish." Certain restrictions were placed upon plaintiff's activities, which also was authorized to publish books and pamphlets using the name.

Plaintiff agreed that it would not "harm, misuse or bring into disrepute the name 'Lampoon',," and agreed not to include any editorial or advertising materials objectionable to the Harvard Lampoon, because "the nature of the material included, or of the goods or services advertised thereby, would or would be likely to constitute a criminal offense . . . expose [plaintiff] to any action or judicial or governmental proceeding . . . or would cause a reasonable parent to make the particular issue inaccessible to a minor; or . . . discourage a reasonable businessman . . . from association with [any] advertiser. . . ."

Defendants claim that despite Harvard Lampoon's reservation of quality control over National Lampoon's publications, the agreement is a "naked license" and confers no rights, because Harvard Lampoon has in fact not supervised National Lampoon's publications.

■ A formal agreement is not a necessity, nor is its mere existence sufficient.

"The critical question . . . is whether the plaintiff sufficiently policed and inspected its licensees' oper-

ations to guarantee the quality of the products they sold under its trademarks to the public." Dawn Donut Company v. Hart's Food Stores, Inc., 267 F.2d 358, 367 (2d Cir. 1959).

I find that the steps taken by the parties to implement Harvard Lampoon's reserved rights and powers under the agreement were sufficient to assure that the quality of plaintiff's product would be satisfactory to Harvard Lampoon.

The Harvard Lampoon was to be furnished all editorial and advertising content in advance of printing to permit the Harvard group to state its objections within 48 hours following receipt. The mechanics of these provisions appear to have been modified by mutual assent, and the Harvard Lampoon, Inc. now exercises its reserved powers by inspection of each issue after printing, but five days prior to distribution. Because plaintiff's present editor, and most of the creative personnel are graduates of the Harvard Lampoon, the reserved supervision of quality standards by the Harvard Lampoon has not created a practical problem; only once was criticism of a particular issue proffered by Harvard, and that criticism was withdrawn after discussion.

■ The nature and extent of the rights conferred by the Harvard Lampoon upon plaintiffs, and the modification of the agreement of October 8, 1969 by the practical construction of the parties, is not such as to cause Harvard Lampoon to forfeit such common law trademark rights as it may have in the word Lampoon, as would be the case in the event of issuance of an unqualified or general license.

I do not find that the 1969 agreement, as drafted or as administered, constitutes a naked license, and conclude that Harvard Lampoon has taken affirmative action to maintain quality and prevent dilution of the mark, and to the extent that it, and its predecessors had a common-law right in the name almost a century old, this right has not been lost.

Pike v. Ruby Foo's Den, 98 U.S.App.D.C. 126, 232 F.2d 683 (1956).

To the extent that Harvard Lampoon has a vested right in the mark by prior usage, it has consented to and approved maintenance of this litigation by plaintiff to protect such rights, as well as plaintiff's own rights.

The Harvard Lampoon and plaintiff, in referring to themselves internally, and even in advertising their various publications, occasionally use the word "Lampoon" without use of the word "National", or "Harvard", as applicable. In practically all circumstances, however, the word is used at least once in any particular situation coupled with the modifying description "National" or "Harvard" as the case may be.

For many years, plaintiff and its parent company have worked in close cooperation with the Harvard Lampoon, assisting it in preparation and national distribution of its parodies of national magazines previously mentioned. Upon superficial examination, these parody issues appear to be genuine, but on closer inspection it is apparent that they are works of humor and satire created by the Harvard Lampoon. One of these parody issues, Cosmopolitan, was co-published by Harvard Lampoon and Twenty-First Century, and distributed by Twenty-First Century. Plaintiff assisted in production aspects of the remaining special parody issues of Harvard Lampoon. It was out of this relationship that the idea for National Lampoon magazine grew. For many purposes, plaintiff may be regarded as an offshoot or affiliate of the Harvard Lampoon, united in interest with it insofar as concerns the use of the mark.

Plaintiff's magazine is distributed through Independent News Company, throughout the United States and Canada by 70,000 news dealers (Tr. p. 149), and is also sold by mail subscription. Circulation of the Lampoon rose from approximately 167,000 copies per issue sold in 1970 to more than 700,000 in 1973 (Tr. p. 39). Sales for 1974 are es-timated at 1,000,000 copies of each issue (Exhibit 7). Newsstand sales of the magazine from 1970 to 1973 increased by 471% (Tr. p. 154; Exhibit 16). Subscription sales amount to about 10% of all sales. Lampoon is second in terms of rate of growth among nationally circulated magazines in the United States (Tr. p. 154). Only "OUI", a voyeurists' publication, has grown faster.

In common with other nationally known magazines, Lampoon claims, by virtue of its "pass-along readership," a considerably greater public impact than its circulation figures would indicate. In theory, the magazine has greater readership than its copies sold would indicate, because each copy is "passed along" by the purchaser to relatives or friends, or through physicians' waiting rooms, to the hands of that ultimate and most appropriate receiver, the garbage man.

In December 1973, National Lampoon commissioned Gilbert Youth Research, Inc., a reputable market research company, to conduct a study which would show Lampoon's pass-along readership among a limited group surveyed, consisting of males between the ages of fourteen and thirty-four. This study purported to show Lampoon reached at least one person other than the purchaser, and possibly as many as five other persons (Tr. pp. 338–40). Assuming circulation for 1973 was about 700,000, the magazine was seen by about a million and a half people, if not the approximately three and a half million claimed by plaintiff. Whichever figure is accepted for ultimate readership, Lampoon has a substantial national public acceptance, or good will.

As would be expected, plaintiff has expanded into various related enterprises in addition to the publication of its monthly magazine. It publishes and sells nationally such items as paperback books, anthologies compiled from the best of its back issues and collections of original material previously unpublished. It also sells posters and polo shirts, has produced three phonograph albums, a re-

vue for the stage and a radio program. Each of these is identified by the National Lampoon or Lampoon mark (Tr. p. 12). On whatever product its name appears, the word "Lampoon" is emphasized; it is shown in larger type below the word "National." Plaintiff's gross revenues from all of its activities in 1973 were approximately $6,800,000.00 (Tr. p. 108).

Plaintiff's off-Broadway revue, "The National Lampoon Lemmings," opened in New York City in January, 1973, ran for about a year and is now on national tour (Tr. p. 12). Approximately 100,000 people paid to see the production in New York and approximately 100,000 have seen it in various American communities while on tour (Tr. p. 37). Plaintiff's revue received extensive media coverage, including mention by defendant ABC on its news program. Portions of that revue were televised nationally on news programs (Tr. p. 77).

The National Lampoon Lemmings is a satirical revue based on the idea that American youth of recent years, in the fashion of the march of the Norwegian lemmings to the sea, has been committing mass suicide by use of illegal narcotics and other group activities which the play holds up to ridicule.

The format of plaintiff's stage revue is composed of scenes supposedly taking place in an open air setting called "The Woodchuck Festival of Peace, Love and Death", an intended allusion to Woodstock, New York. A master of ceremonies introduces various acts, mostly singers, who purport to be contemporary rock stars or folk musicians such as Bob Dylan or James Taylor. These perform-

ers mimic, ridicule and parody the style of such well known stars. The musical compositions are satirical parodies of songs of the particular stars being pilloried, written for the show by National Lampoon staff members, concerning subjects such as ecology, politics and drug addiction, and conveying an uplifting message to the audience.[1]

Beginning in November 1973, the "National Lampoon Radio Hour" went on the air. It is broadcast on Saturday or Sunday evening, over approximately 156 radio stations across the country (Exhibit 8). Not all are "FM" stations, although the program has been more popular in that segment of broadcasting. That program is promoted over the radio stations which broadcast it, and also by spot television commercials urging television listeners to hear the Lampoon hour over named radio stations. Like the magazine, the radio program is composed of various kinds of materials, skits, monologues, songs, also of an irreverent, disrespectful nature, satirizing topical subjects such as the energy crises, Watergate, politics generally, the ecology movement, the use of illegal narcotics, and whatever else may be of current interest.

There is no master of ceremonies on the Lampoon radio program, and each piece of material fades out, followed without introduction by another, usually unrelated, and unlike the previous presentation. The radio programs have been tailored so that they are less likely to offend a substantial segment of the audience. This has been done, undoubtedly, in recognition of the different standards of taste and greater number of taboos and sacred cows which must be

---

1. The message, transmitted by irony, satire and ridicule is beamed at our younger generation, and tells them "don't drop out, especially not with drugs." Typical is the first stanza and chorus of the "Lemmings Lament" from "The National Lampoon Lemmings" revue, a song containing the following lyrics sung by the entire cast:

"Between the politicians polorizing power trips

We were just too pure and peaceful to decide,

So we got our heads together while the planet fell to bits

Now the one side left to take is suicide.
(Chorus)
We are lemmings,
We are crazies,
We will feed our flower habit
Pushing daisies."

segment**740**

respected by radio stations, compared with a magazine or stage show.[2]

The phonograph album entitled "National Lampoon Radio Dinner" is of a format similar to the National Lampoon Radio Hour, although some of the language and subject matter would be regarded as unacceptable by current standards, either for radio or television.

The "National Lampoon Lemmings" phonograph album consists of songs and other portions from the stage revue.

A third, and the most recently issued phonograph album, entitled "The Missing White House Tapes," parodies a television commercial offering a phonograph album for sale. It opens with the voice of an announcer who introduces himself with a heavy Hispanic accent, as "Bebe Rebozo". He touts for sale, and then plays a series of skillfully reconstructed statements in the actual voice of President Nixon, spliced and pieced together from various Presidential speeches and interviews, which have been "electronically rechanneled" with the result that the President admits to acts of surpassing criminality which must be heard to be appreciated.[3]

Under contract dated September 28, 1973 with Video-Tape Network, Inc., plaintiff is presently producing and taping material from the National Lampoon Lemmings revue for broadcast on closed circuit television. Within two weeks of completion of that program, plaintiff is to begin taping the first of two thirty-minute television variety programs pursuant to the same agreement. These programs will not be available to the general public. They will be leased to colleges and shown on college campuses over closed circuit television (Tr. p. 83). The programs are to be similar in format and content to the radio programs, adapted, of course, to television so that visual effects, such as animation or cartooning can be used (Tr. p. 83-4).

All of the editorial material for these many enterprises is created by the editorial staff of the National Lampoon magazine, and all productions are supervised by the same persons. Each activity may readily be seen as a natural outgrowth of the prior activities. It was natural to foresee expansion of plaintiff's activities to national television.

*Plaintiff's Transactions with ABC*

The William Morris Agency ("Morris") is a well-known theatrical booking organization, merchandiser and adviser of artistic talent in many fields. Its clients include National Lampoon, among many others. It also has professional relationships with ABC. Early in 1973, representatives of National Lampoon discussed with Morris the possibility of writing and producing several television "Specials" for release on major network nationwide television.

Mr. Arnold Sank of Morris, spoke with Mr. Fred Rappaport, then an executive of ABC, stationed in New York. Rappaport told the Morris Agency he believed a way could be found for "translating National Lampoon creativity into television" (Tr. p. 113). Following that conversation, a meeting was arranged at the offices of ABC in New York on July 26, 1973.

The July 26th meeting was attended by Mr. Gary Pudney, an ABC Vice President, whose office is in California, Mr. Rappaport of ABC, Mr. Arnold Sank of

---

2. It has generally been recognized that the freedom of expression, and indeed the First Amendment rights of licensed broadcasters, are subject to more limitation than publishers, and performers on the stage. See, *e.g.* Red Lion Broadcasting Co. v. F. C. C., 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969).

3. National Lampoon's anti-establishment attacks are not directed exclusively against the President. Recently, Senator Edward M. Kennedy, who now leads in the popularity polls of Presidential aspirants, was the subject of a parody advertisement of Volkswagen automobiles in Lampoon's recent anthology. The "advertisement" shows a Volkswagen afloat, with a caption reading: "If Ted Kennedy drove a Volkswagen, he'd be President today." See Volkswagenwerk A. G., et al. v. National Lampoon, Inc., 73 Civ. 4515 (S.D.N.Y. filed October 23, 1973).

Morris, as well as Mattie Simmons, President of plaintiff, and perhaps other representatives of National Lampoon (Tr. p. 114).

There are disputed versions of what took place. Mr. Sank testified Mr. Rappaport said he had seen the National Lampoon Lemmings stage revue prior to the meeting and that Mr. Pudney had told those present that he heard "a lot about the Lemmings show", and was acquainted with the magazine, which he liked and enjoyed (Tr. p. 114). Mr. Pudney, on the other hand, testified that he never heard of the Lampoon Lemmings stage revue before the meeting, and that although he was familiar with the fact of its existence, he "had never seen the National Lampoon magazine."

Conflict arose at the meeting because Pudney, who was in charge of producing "series", that is regularly repeated seasonal programs, wanted more than the "four to six Specials" featuring Lampoon's name, format and genre which Morris was offering.

Mr. Sank and Simmons on the other hand testified that it was made clear at this meeting, by them, that the creative writing requirements for a weekly series would be so burdensome as to impinge upon the quality of the work Lampoon's staff could produce.

While all need not have worn the Crimson, mordant wits of the sort who write Lampoon's material would seem to be born, not made. There is, therefore, a limit to the quantity of this type of humor which may be created against a time deadline. Plaintiff's staff is presently responsible for a magazine, anthologies, albums, books, a stage revue, radio programs and closed circuit television. Mattie Simmons, President and Chairman of the Board of plaintiff, was correct in his observation made to Pudney and Mr. Sank of Morris on July 26th, that it would be impracticable for his organization to write such material for a regularly scheduled weekly series and that an attempt to do so would soon run out of fun. He wanted to produce

no more than four to six television "Specials" during the year. Later events show that Pudney apparently agreed with Simmons' assessment of his own capabilities.

Nevertheless, despite Simmons' view of his own limitations, according to the testimony, both of Mr. Sank and Mr. Simmons, I find Mr. Pudney expressed interest in further negotiations.

Mr. Sank testified (Tr. p. 115) that Mr. Pudney's expressed view with regard to creating a television vehicle for National Lampoon was: "That is interesting, I would like to explore it more. Can I get some of the magazines? I would like to acquaint myself even more in depth with the magazines, read them. I'll take them with me to London and read it on the plane, or whatever. I will try to see the Lemmings show to get a feel of what the material is about, see the talents." Mr. Pudney further said "he would try to see the Lemmings show upon his return from London. . . ." (Tr. 115–16) During the course of the discussions, the proposed "Specials" were always referred to as the "National Lampoon Specials" (Tr. p. 117). As Pudney requested, copies of the Lampoon magazine, special editions and phonograph records were delivered to him.

Some concern was expressed by ABC at the July 26th meeting about adapting National Lampoon Lemmings revue for television, but it was pointed out that National Lampoon had much more to offer than could be found in that revue. This obviously was not a major sticking point in the discussions, despite Mr. Pudney's statement that at the time of the meeting, he was "under the impression that the material in the National Lampoon was of a rather caustic, 'blue' nature." (Tr. p. 480) This judgment, presumably, he formed before he had ever seen the Lampoon magazine, and continued after he read the materials furnished him, as he concededly did.

Both Mr. Sank and Mr. Simmons testified that they left the meeting under-

standing that negotiations were to be continued.

Mr. Pudney's account is considerably at variance with this. He asserted that from the first meeting onward, he had absolutely no interest in working with National Lampoon, not only because the material was unsuitable for television, but more importantly because National Lampoon wanted to produce specials. Mr. Simmons' and Mr. Sank's testimony directly contradict this assertion.

Sometime in late August, Mr. Pudney met with a representative of Morris in California as a follow-up to the July meeting. Mr. Pudney testified that he "told them that there was no interest." (Tr. p. 479) But ABC's interest in the project obviously had remained active; a subsequent meeting was held at ABC's offices in New York in late November 1973 (Tr. p. 102, 435) with Mr. Hay of ABC. He testified that his objection to doing Lampoon specials was to the type of material in their magazine, although he did not review material submitted to him by National Lampoon from its national radio hour. After this meeting, Mr. Simmons wrote to Mr. Hay summarizing their discussions, giving a brief outline of the proposed format and material for the project, and acknowledging that "we can't do many things on television that we do in print." (Exhibit 15).

About two weeks after this second meeting, Mr. Memoli of the Morris Agency brought to Mr. Hay's attention the fact that Mr. Pudney was working with Mr. Schlatter on the proposed series to be called "Lampoon." Mr. Hay telephoned Mr. Pudney to confirm this information, and told Mr. Pudney he (Mr. Hay) had recently met with the Lampoon people. Mr. Pudney acknowledged that he had met with them earlier, with Rappaport. The overall impression created by Mr. Pudney's testimony was evasive and unconvincing; his memory poor. (Tr. p. 442).

No further negotiations were had by or on behalf of plaintiff with ABC. Mr. Hay's explanation for this is not that two programs of similar format with "Lampoon" as part of their titles could not be broadcast simultaneously over the same network, but rather that "certain material that I had seen that I was aware of would not meet the standards of the network" (Tr. p. 440).[4]

4. This refers to material described by Mr. Pudney as too caustic and "blue." Exactly what Mr. Pudney, ABC or the television industry considers "blue" material is unclear, but certainly some of the following topics and comments from Exhibit E, the Schlatter script, should fit a reasonable definition of "blue."

There are skits such as the "Abortion Hot Line," an organization ostensibly set up to assist young women obtain abortions. After taking down the names and addresses of applicants, the interviewer calls "Computer Date" and asks: "Want to buy the names of twelve real swingers?" (Ex.E, p. 34)

One skit entitled "Robbery-Pat/Bo", ends with the robbery victim, a man, having given up the rest of his clothes, being forced to divest himself of his [ladies] pantyhose and G-string. (Ex. E., pps. 84–88)

There are songs such as "Lampoon Welcome", which is divided among various cast members, defining the word "lampoon." Lyrics include: "The word can be used as a noun: 'Doctor, there's something wrong with my lampooner.' It can be used to de-

note aggression: 'Go lampoon yourself!' Or a slogan to instill pride . . . 'Up your lampoon.' . . . Or as an excuse: 'I can't lampoon tonight . . . I have a headache.' The song also contains ancient limericks such as:

"There once was a sailor named Spooner
Who took a young girl to his schooner.
He plied her with wine, until she felt fine,
But she still wouldn't let him *lampoon* her."
[*sic*, but it's been "harpoon" for at least a century.] (Ex. E, pps. 60–66)
Periodically during the program, one of the women cast members appears and sings songs, such as "I'm In Love With a Gay Activist;" "I'm In Love With a Bi-Sexual;" "I'm In Love With a Transvestite;" "I'm In Love With Father Hoolihan." The lyrics of this last effort read:

"I'm in love with Father Hoolihan
Though I know it cannot be
I'm in love with Father Hoolihan
But he's in love with Sister Marie."
(Ex. E, p. 91)
The situation with regard to blue material is summed up in Exhibit 17, submitted by En-

As noted, Hay had not heard the radio programs which plaintiff had been distributing.

### Transactions between ABC and the Schlatter defendants

Defendant George Schlatter is a true humorist and wit, with a substantial record of achievement as a writer and producer of satirical and humorous materials for television. He conceived and authored a well-known program known as "Laugh-In," on another network, and was able to keep it alive with new topical material and produce it successfully for a number of years, beginning in January 1968. This involved creation of more than 128 separate programs, funny without repetition. Mr. Schlatter described this work, correctly, as being "on the other side of difficult" (Tr. p. 228). His reputation in his chosen field is of the highest.

Both Schlatter and Pudney testified to prior discussions with reference to the development of a weekly series of satirical television programs. Originally this proposed work was unnamed. Pudney testified that in late October or early November 1973 a formal presentation for the series was made, and that it was then the series acquired a title; the title it received was "Lampoon" (Tr. p. 470). Mr. Pudney testified that this proposed script or outline consisted of approximately 20 or 30 pages, describing a satirical comedy program. He said he returned the document to Schlatter. It was not produced at the trial.

A paper (Exhibit 17) marked "Second Draft" is entitled "Lampoon", and is also a presentation for such a program. A copy was received January 26, 1974 at ABC. The document shows intrinsically that it could not have been created prior to the last week in November 1973, and probably was not given to ABC prior to December 5, 1973, the date it was registered with the Writer's Guild of America, West, Inc. See date stamp on second page.

terprises to ABC in January 1974 in which it is said (p. 5):

> "Most comedy has a 'victim' and all comedy seems to upset *someone*. I'm sure LAMPOON will generate calls and letters, but the public has grown up in the past few years and can accept sophisticated humor much more easily than ever before.
>
> "We *must* deal with controversial subjects and provocative concepts, but we will do it with taste, charm and wit. Our goal is to amuse, not to offend.
>
> "Much of the safety of this form is in its speed. We don't dwell on any one subject or premise long enough for anyone to get too uptight." (Emphasis in original.)

In the same exhibit, we are told (p. 2):

> "The last five years in America have, for the most part, been comparatively . . . *Humorless*!
>
> * * * * *
>
> "There was humor in the 'Kennedy Era'; the Kennedy family . . . Jackie . . . the kids . . . the football games. In spite of major national and international problems, President Kennedy had charm and wit, making his brief moment in history a time when the country seemed ready to laugh and was receptive to humor.
>
> "Even the 'Johnson Era' had humor. The barbeques at the White House . . . the activities on the Perdanales . . . Lady Bird . . . all the little Birds . . . The President getting a speeding ticket . . . picking up his dog by the ears, showing the press his scar . . . these humorous moments helped to ease the anguish brought about by the many problems the nation faced.
>
> * * * * *
>
> "In 1968 our national sense of humor began to shrink. This is not a statement of political philosophy, but an analysis of comedy.
>
> "Without question, the 'Nixon Era' has been singularly the most humorless time in the recent history of our country.
>
> "Democrats and Republicans . . . Bureaucrats and drop-outs, all agree that until the last few months, humor, wit, and comedy in general have hardly been enjoying a renaissance in Washington, on the campus, on records, in nightclubs or on television. It has been almost impossible to do any kind of satire. Americans just were not in a funny mood. For three seasons now Archie Bunker has said 'damn' and 'hell' and flushed his toilet a lot, but that is about as funny as things got."

Schlatter apparently had not listened to the White House Tapes record (Ex. 5).

That Pudney or someone else from ABC asked Schlatter to prepare Exhibit 17 may be inferred from Exhibit 18 in which Schlatter's lawyer writes ABC:

"I have tried to compromise some matters even though I thought it was demeaning to do so in view of the good faith demonstrated by George Schlatter in preparing a presentation without first making a deal and without requiring any payment for that work. We have therefore decided that what ABC should do if they want to make a deal for this show is pay the proper price without haggling."

The first draft of a formal agreement (Exhibit 20) was sent to the attorney for Enterprises by ABC's legal department. It provided in relevant part:

"The title of the Special and the Series shall be subject to ABC's prior approval and such title shall be deemed to be furnished by Packager as an element of the Special (and, if ABC exercises its Series Option, the Series); and, without limiting the foregoing, it is specifically agreed that if ABC approves the title LAMPOON or ABC's LAMPOON or any other title which includes the word LAMPOON, such title is deemed to be furnished by Packager and, of course, covered by Packager's indemnity set forth in subparagraph XI (a)."

As of November 19, 1973, Enterprises had protected itself as to the indemnity by obtaining a search and opinion, attached to Exhibit 17. Although no formal contract had been signed at the time of the trial, and some points of consequence remain subject to negotiation, production had begun.

Sometime in late November or early December, 1973, National Lampoon discovered, either through King-Hitzig Productions or through the Morris Agency, that defendants were planning to produce a program of contemporary satire calling it "Lampoon". Attorneys for plaintiff wrote Mr. Pudney on December 12, 1973 (Exhibit 32) with copy to Mr. Schlatter, protesting such use of the name "Lampoon" by defendants. Before defendants had done any substantial work on the script (Exhibit 1, ¶ 29), much less begun production, they were on notice of plaintiff's objection to the use of the name "Lampoon".

The time sequence of the meetings between National Lampoon and ABC, and the subsequent creation and appearance of the Schlatter presentation with the title "Lampoon" belies any suggestion of mere coincidence.

The Court finds it impossible to believe that the selection of the title "Lampoon" for ABC's program, out of a universe of possible titles, was fortuitous, in view of the negotiations between ABC and National Lampoon which began in July and continued until the end of November 1973.

Mr. Pudney of ABC was present at the July meeting and was engaged in negotiating with Mr. Schlatter at the same time. Suddenly, in November or December, a hitherto nameless proposed weekly television comedy series, which, as noted below, p. 27, we find substantially identical in format and content to certain National Lampoon productions, acquired the name "Lampoon".

The work which defendants threaten to broadcast on April 5, 1974, unless enjoined by this Court is intended to be entitled simply "Lampoon." This title was later modified, tentatively, to "ABC Lampoon" with the thought that such modification might improve defendants' posture in this litigation, or mollify plaintiff and eliminate controversy, but defendants' posture on the record is that they maintain the right to call it simply "Lampoon," as they choose, or "ABC Lampoon."

Of course ABC may have preferred to deal with Schlatter because he was willing to produce a series, rather than merely four to six Specials, or because of his proven record of success with the program "Laugh-In", or because of a belief he could do better work.

■■ ABC was under no obligation to sign a contract with National Lam-

poon, but it cannot exploit National Lampoon's name and reputation or pass off its goods as those of plaintiff's. Upon the entire record, we conclude that defendants' use of the name or title "Lampoon" is an attempt to do just that. We express no opinion on the part of Mr. Schlatter played in this effort; there is nothing in the record to suggest he knew about ABC's negotiations with National Lampoon. But Pudney knew, and it was he who directed that the presentation be prepared.[5]

The format and content of the program defendants propose to produce under the name "Lampoon" is identical to and indistinguishable from that of plaintiff's work, although we express no opinion as to quality, which is of course a matter of taste. Specifically, Exhibit E, the Schlatter scenario, is almost identical with the plaintiff's radio programs (Exhibit 6) and the record album, entitled "National Lampoon Radio Dinner" (Exhibit 5) in format, themes and style. All feature humorous materials of various types, parodying and satirizing usually topical events. These are presented in no apparent order, with no narrative override or master of ceremonies to unify or explain a conglomeration of songs, monologues, skits, blackouts, and sketches.

Defendants' program is intended to be "typified by its outrageous premises and its speed in touching on many issues and situations. It will reflect the amused confusion that typifies our times." (Exhibit 17, p. 4). We find this an equally apt description of plaintiff's radio program.

The primary set for defendants' program which serves as a model for smaller versions of the same set (Exhibit C) would consist of the word "Lampoon", constructed of separate blocks of wood for each letter. The "L" was to be 10 feet high and three feet deep. The remaining letters would be about six feet

high by three feet deep (Tr. p. 275). The opening of the program makes use of the large set, and another set silhouetted in the distance. As described by Mr. Schlatter, "we shoot the word 'lampoon' from every angle ala Great Western Commercial. . . '." (Tr. p. 277). The commercial, not shown in eastern states, is being parodied in a manner which would be recognizable to viewers on the West Coast. Throughout the program, the original set and reproductions of it re-appear. Members of the cast assemble in front of the set and recline on a four foot model of the set; the two "o's" become eyes, which sometimes open, look in different directions and cross; puffs of smoke come out of the "L" and the "P". The net effect is to bear down on the word Lampoon throughout, and make it more than a mere title. See Exhibits C, D and D-1.

Typical of the use of the set for transition between scenes is found on p. 28 of Exhibit E. The eyes open and look up at a girl lying on the "o" or the "poo" of the set. The letters then look forward, the eyelids on the two "o's" close, the camera pushes in through an "o" to the next scene.

In sum, a reading of Exhibit E shows that substantially the same kind of creative material is to be passed off, over network television under a substantially indistinguishable title or name as that used previously by plaintiff on radio or closed circuit television, as well as in other fields previously mentioned and closely allied to network television.

*Irreparable Damage.*

Mr. Pudney, an expert in the field, conceded (Tr. p. 480) a conflict of titles would result if two programs were run each week, one under the title "Lampoon", or "ABC Lampoon", and the other under the title "National Lampoon", provided the programs were similar in content and format. This conclusion seems obvious and correct.

---

5. We place no reliance on Exhibit 20 in this regard, which purports to attribute ownership of the name entirely to Enterprises.

This was written after the controversy arose.

The mere announcement to the trade of defendants' intentions appears to have chilled negotiations begun in November 1973 between plaintiff and a third party, King-Hitzig Productions, for the creation and production of television Specials.

Defendants assert plaintiff could not be irreparably damaged because it could not adapt its work to the requirements of a national viewing audience. In this regard, I discredit entirely Mr. Pudney's opinion that plaintiff's material is so "blue" that he found it unsuitable for television, and believed it could not be made so. Plaintiff has adopted different standards of taste for its magazines, its stage revue, its radio program and its current closed circuit television efforts. It recognizes that different media have different taboos and additional sacred cows which enjoy immunity. Plaintiff has shown a capability for adapting the material to the media.

National Lampoon recognized, as its letter of November 28, 1973 (Exhibit 15) to ABC shows, that further alterations would have to be made to meet the more restrictive standards of national television.

Schlatter's proposed work (Exhibit E) contains a number of items which could be characterized as "blue." While we understand that the exhibit has not yet been censored by ABC, the fact remains that there is nothing about National Lampoon's product which renders it more unsuitable or less adaptable for television than Schlatter's product, Mr. Pudney's testimony to the contrary notwithstanding.

## CONCLUSIONS OF LAW

### Misdescription

■ Plaintiff is entitled to relief under 15 U.S.C. § 1125(a), which reads in relevant part as follows:

"(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services' . . . a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce . . . shall be liable to a civil action . . . by any person who believes that he is or is likely to be damaged by the use of any such false description or representation."

A cause of action under this section arises when a trademark or name used in interstate commerce is likely to cause confusion, or to deceive purchasers into believing the source of origin of the goods is another. Geisel v. Poynter Products Inc., 283 F.Supp. 261, 266–268 (S.D.N.Y.1968).

■ Standing to sue exists in anyone who "is or is likely to be damaged" by the defendant's use of the disputed mark, and the parties need not be direct competitors. Fleischmann Distilling Corp. v. Maier Brewing Co., 314 F.2d 149, 151 (9th Cir. 1963), cert. den., 374 U.S. 830, 83 S.Ct, 1870, 10 L.Ed.2d 1053.

Although plaintiff has not yet produced a television program for national broadcast, it has begun production of programs for closed-circuit television and is negotiating for production of a special program which it hopes to sell to one of the large networks. Network television is within the plaintiff's area of natural expansion; it is now making efforts to expand into that area. As we have already pointed out, broadcast of defendants' program will effectively cut off such expansion.

■ Two programs, one entitled "National Lampoon" and one entitled either "Lampoon" or "ABC Lampoon", with the same format, conception and similar humorous material will cause confusion. The acts of defendant ABC show an intent to trade upon the national acceptance and reputation built up by National Lampoon and to pass off its program as a National Lampoon product.

"Indeed, it is generally true that, as soon as we see that a second comer in a market has, for no reason that he can assign, plagiarized the 'make-up'

of an earlier comer, we need no more; for he at any rate, thinks that any differentia he adds will not, or at least may not, prevent the diversion and we are content to accept his forecast that he is 'likely' to succeed. Then we feel bound to compel him to exercise his ingenuity in quarters further afield." American Chicle Co. v. Topps Chewing Gum, 208 F.2d 560, 563 (2d Cir. 1953)

Indeed, when such "an intent [to deceive] is shown, it raises a presumption that deception and confusion resulted." National Van Lines v. Dean, 237 F.2d 688, 692 (9th Cir. 1956). Deliberate "passing off" is not only evidence of likelihood of confusion, but of secondary meaning as well. Mortellito v. Nina of California, Inc., 335 F.Supp. 1288, 1295 (S.D.N.Y.1972).

▇▇▇▇ Strong evidence of secondary meaning has been presented by plaintiff. Although it has been in existence only since 1969, it has made extensive, successful efforts to bring its name into public consciousness through the circulation of its magazine, which as noted above, reaches millions of consumers, as well as its other products. Even assuming secondary meaning had not yet come to full fruition,

"A mark with secondary meaning in the making should also be protected, at least against those who appropriate it with knowledge or good reason to know of its potential in that regard, or with an intent to capitalize on its quality. 'Piracy should no more be tolerated in the earlier stages of development of quality than in the later.' " 3 Callman, Unfair Competition Trademarks and Monopolies, (3d ed. 1971) p. 356

Public confusion as to the source of the program is inevitable. Plaintiff, therefore, has standing to sue and has established its right to relief under 15 U.S.C. § 1125(a). Assuming plaintiff had no trademark rights, it is "not a prerequisite that the mark be registered." Mortellito, supra, 335 F.Supp. at 1294.

## Unfair Competition and Dilution

▇▇▇▇ Plaintiff also establishes a right to relief under New York law. To prevail under the common law of unfair competition and General Business Law § 368-d, plaintiff need not prove more than notice to defendants, which was timely given, and that there will be dilution of the mark which will have a detrimental effect, particularly in an area of normal expansion.

"A wrongful attempt to suggest an association or connection of some sort is sufficient to warrant relief to prevent confusion in the public mind as well as dilution of plaintiff's trade name. . . . " Vaudable v. Montmarte, Inc., 20 Misc.2d 757, 759, 193 N.Y.S.2d 332, 335 (Sup.Ct., N.Y.Co.1959)

In addition, the plaintiff need not prove secondary meaning.

"The law of unfair competition no longer requires that plaintiff's business and advertising shall have acquired a 'secondary meaning.' [citations omitted] 'The controlling question in all cases where the equity power of the courts is invoked is whether the acts are fair or unfair, according to principles recognized in equity.' [citations omitted]." Santa's Workshop, Inc. v. Sterling, 282 App.Div. 328, 329–330, 122 N.Y.S.2d 488, 489 (3rd Dept. 1953)

Under New York case law, "[t]he likelihood of damage through 'dilution' of its mark or symbol is enough." Renofab Process Corp. v. Renotex Corp., 158 N.Y.S.2d 70, 77 (N.Y.Co.Sup.Ct.1956).

## Trademark Infringement

▇▇▇▇ Plaintiff claims defendants' intended use of the word "lampoon" violates their rights in their registered trademark. Although "lampoon" is an English word commonly found in dictionaries, it is not for that reason incapable of being used as a trademark, nor for that matter is it precluded from protection under the Lanham Act. Numerous cases which support this conclusion include: Hanson v. Triangle Publica-

tions, Inc., 163 F.2d 74 (8th Cir. 1947) ("Seventeen"); Conde Nast Publications, Inc. v. Vogue School of Fashion Modelling, Inc., 105 F.Supp. 325 (S.D. N.Y.1952) ("Vogue"); Esquire, Inc. v. Esquire Bar, 37 F.Supp. 875 (S.D.Fla. 1941) ("Esquire"); Avon Shoe Co., Inc. v. David Crystal, Inc., 171 F.Supp. 293 (S.D.N.Y.1959), aff'd, 2 Cir., 279 F.2d 607 ("Haymaker"); Atlantic Monthly Co. v. Frederick Ungar Publishing Co., Inc., 197 F.Supp. 524 (S.D.N.Y.1961) ("Atlantic"); Johnson Publishing Co., Inc. v. McLendon, 133 U.S.P.Q. 486 (1962) ("Ebony"); Londontown Mfg. Co. v. Cable Raincoat Co., 371 F.Supp. 1114 (S.D.N.Y.1974) (Gurfein, D. J.) ("Fog"); Purex Corporation, Ltd. v. Maryland Paper Products Co., 287 F.2d 186, 48 CCPA 848 (1961) ("Sweetheart").

■■■ Where, however, such a word is a generic term, trademark protection will not be available. The leading, or perhaps the furthest out case, cited for this proposition is Henry Heide, Inc. v. George Ziegler Co., 354 F.2d 574 (7th Cir. 1965), in which the term "jujube", defined in the American College Diction-

ary as "the edible plumlike fruit of any of certain Old World trees of the genus *Zizyphus*," was held to be a generic term when used for candy and gum. Another such case is Donald F. Duncan, Inc. v. Royal Tops Mfg. Co., Inc., 343 F.2d 655 (7th Cir. 1965), in which the court invalidated the trademark "Yo-Yo" on the ground that the word had long been used in the Philippines for such a toy and had also become recognized by the general public in the United States as a descriptive name for the toy.

Lampoon is a word of French derivation said to have become English by importation from a French tippling song. The chorus in that song, after each verse sang "lampons, lampons, lampons," freely translated as "let's drink to that", or an affirmation by the chorus of the truth and timeliness of the witty observation made by the prior verse.

Although the Harvard Lampoon, as noted, has used the title for more than a century, we regard the word as somewhat unusual and not one used in the common language in this country.[6]

Plaintiff's recent nationwide activities and recent activities of the Harvard

---

**6.** American College Dictionary, Random House, 1970:

"lampoón...n. 1. a malicious or virulent satire upon a person in either prose or verse. --v. t. 2. to assail in a lampoon."

Webster's Third International Dictionary, 1963:

[1] "lampoon, n. ... 1: a polemic satire usu. directed against an individual [had written a 'scurrilous _____' in Latin verse about him ...] [corridors hung with colored _____s of English barristers—Louis Auchincloss]— compare pasquinade; 2: a light mocking satire [the old farces and later musical _____s—G. J. Nathan]. [2] lampoon, v.t.: to make the subject of a lampoon: ridicule, satirize ... [was viciously _____ed by the cartoonists—Newsweek] .... "

The Random House Dictionary, 1966:

"lampoon ... n. 1. a sharp, often virulent satire directed against an individual, a social institution, a government, etc.; a work of literature, art, or the like, ridiculing severely the character or behavior of a person, society, etc. --v.t. 2. to mock or ridicule in a lampoon . . . .. Syn. 1, see satire"

Webster's New International Dictionary, 1934

"lampoon n. a personal satire in writing, usually malicious or abusive. ... *Syn.*--lampoon, pasquinade. A lampoon is a malicious and abusive satire directed against an individual; a pasquinade ... is commonly a lampoon to which especial publicity or notoriety is given.... v.t.; ... to subject to abusive ridicule expressed in writing; to make the subject of a lampoon ... *Syn.*--libel, defame, satirize, lash."

The Shorter Oxford English Dictionary, 3rd ed., 1955:

"Lampoon ... A virulent or scurrilous satire upon an individual."

Funk & Wagnalls New Standard Dictionary, 1949:

"lampoon ... vt. To abuse or satirize in a lampoon. [The orators and journals of the opposition were ridiculing and lampooning him without measure. (Carl Schurz, Abraham Lincoln, p. 61 [H.M. & Co. 1892])]; lampoon, n. A written satire aimed at the character of a person and designed to bring him into ridicule; a personal and sarcastic publication; pasquinade. [There were endless jokes and lampoons about this marriage at court. (Thackeray, Henry Esmond bk. i, p. 17 [H.])] ... "

Lampoon previously mentioned have brought the word into national attention. Defendants showed a quotation from William Safire's column (Ex. K), but must recognize that Safire has a comparatively diverse vocabulary. The increasing popularity of the word "lampoon" can be treated in part at least as caused by plaintiff's and Harvard's usage. Comparable is the popularization in the United States of the word "tycoon", an archaic expression used to describe the Shogun of Japan, who were similar to feudal lords, but who at one time were more powerful than the Mikado himself. Through the efforts of F. Scott Fitzgerald and Time magazine, the word is now commonly used in this country to denote a successful businessman.

The word "lampoon" does not, at least today, identify a type or classification of humor, nor does it identify a product such as a magazine, nor an ingredient of any product, as a generic term does. Rather, it describes humor, in the sense of sharp, biting wit, and such descriptive or suggestive word may achieve a secondary meaning; that is, products the source of which is plaintiff, or Harvard Lampoon.

 Plaintiff's substantial activities seem to have acquired for its mark secondary meaning not only in magazines, but in radio, in television advertising and news events and closed-circuit television, with the result that plaintiff shows a protectible interest in these areas. The proprietor of a registered mark for a magazine may re-register it for the television field. The fact that plaintiff has not done so, however, does not foreclose it from preventing the use of its mark by defendant. The principle was well stated in Conde Nast Publications v. Vogue School of Fashion Modelling, Inc., 105 F.Supp. 325, 330 (S.D.N.Y.1952):

"One may not by adopting a common word as a trade mark acquire through usage the exclusive right to the use of what is public property. However,

words in the public domain may, through continued application to a specific product or in a specific field of . . . commercial activity, acquire an association with the user and the product or field so as to create in the public mind a syndetic meaning for the word. 'Vogue' is a word of common usage. . . . [But] [i]n the world of fashion, plaintiff has acquired a common law right to its exclusive use. The extent and boundaries of that use covers the range of ordinary associations that is formed in the public mind; it includes fashion modeling and schools where fashion modeling is taught."

Vogue had trademarks covering only publications; defendant operated a modelling school. Whether or not there was actual confusion, the court held that defendant's use of the name "Vogue" would lessen the distinctiveness of plaintiff's mark and perhaps impair plaintiff's reputation. See also W. E. Bassett Co. v. Revlon, Inc., 435 F.2d 656 (2d Cir. 1970); Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538 (2d Cir. 1956).

 I find no merit to the claim of fraud on the Patent Office, where the registration was for "National Lampoon" used on magazines. Even if the registration were voidable for fraud, the common law rights of plaintiff would not be lost.

Since plaintiff shows a clear right to relief under the Lanham Act, Sec. 43(a), further discussion of general principles of trademark law is unnecessary and would unduly prolong this opinion.

*The Necessity for Equitable Relief.*

 Even if we assume defendants' program will be funnier, or better, or more acceptable in regard to its conformity with general public standards of taste, than a television series which plaintiff produced, nonetheless irreparable injury is present. The good will and product acceptance of plaintiff's existing radio program, closed circuit television,

phonograph records, and even its magazines will be seriously impaired by the presence in the marketplace of a program under so similar a mark and so similar a format and audience appeal.

Trash though it may be, plaintiff's magazine does have a consistent "product quality" as do its other products, and consumer identification with the mark, obtained through expensive and difficult efforts over a period of years.[7] Customers expect this type of humor, to these standards of appeal, in all products originating with plaintiff. It has a right to exploit the "good will" attached, and may not in equity be permitted to be foreclosed by defendants' actions. It is natural for plaintiff, as it has planned for some time, to expand under its own name into the field of network television. That this will be difficult or impossible if defendants persist in televising their product under the name "Lampoon" or "ABC Lampoon", is obvious, and borne out by the testimony of Sank, Memoli and Pudney, as well as that of Simmons.

Money damages are inadequate. The law recognizes that the consequences of trademark infringement, or passing off, and unfair competition generally, are by their nature not fully compensable by money damages. See Omega Importing Corp. v. Petri-Kine Camera Corp., 451 F.2d 1190, 1195 (2d Cir. 1971).

On a balancing of the equities, defendants' program has not yet been broadcast; the title is not a prerequisite to its success, and all time and money invested by defendants occurred with notice of plaintiff's rights, after plaintiff's demand letter dated December 12, 1973 (Ex. 32).

## CONCLUSION

Plaintiff is entitled to permanent injunctive relief consistent with the foregoing. On March 28, 1974, in view of the shortness of available time, the Court announced its decision at a hearing in open court, and set forth in some detail, beginning on page 3, line 7, of the transcript, the nature and extent of the relief to be granted.

The foregoing constitutes findings of fact and conclusions of law pursuant to Rule 52, F.R.Civ.P.

Settle a final judgment in Room 604 on 48 hours actual notice, or upon waiver of notice.

---

7. We must remain mindful of Dr. Bentham's admonition that "Push-pin is as good as poetry." Lampoon's works are so regarded by many, to plaintiff's not inconsiderable profit.