**HARLEQUIN ENTERPRISES LIMITED,
Plaintiff-Appellee,**

v.

**GULF & WESTERN CORPORATION,
Defendant-Appellant.**

**No. 532, Docket 80–7770.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 2, 1981.

Decided March 25, 1981.

Ronald S. Rauchberg, New York City (Proskauer, Rose, Goetz & Mendelsohn, William J. Schwartz, New York City, of counsel), for defendant-appellant.

Thomas C. Morrison, New York City (Patterson, Belknap, Webb & Tyler, Christine H. Miller, New York City, of counsel), for plaintiff-appellee.

Before LUMBARD, MANSFIELD and MESKILL, Circuit Judges.

LUMBARD, Circuit Judge:

Defendant appeals from a preliminary injunction order entered by Judge Owen of the Southern District of New York. The order directs Simon & Schuster, a division of the defendant, to cease using the cover format it had adopted for a new series of romance novels titled "Silhouette Romance." Judge Owen granted this relief on the ground that the "Silhouette Romance" cover design infringes upon that of the "Harlequin Presents" romance novel series sold by plaintiff Harlequin Enterprises Limited ("Harlequin") in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). He also decided that Harlequin's delay in seeking an injunction did not bar relief. We agree and, accordingly, affirm the order of the district court.

I.

Harlequin, a Canadian corporation, is the world's largest publisher of paperback romances. Each month several new Harlequin titles are sold in drug stores, supermarkets and bookstores around the world to millions of regular and devoted readers.

Each Harlequin title is part of a different series. The instant dispute concerns only the Harlequin Presents series. From a design standpoint, every book in the Harlequin Presents series is uniform in its dimensions, cover design and colophon. The editorial content is also consistent, featuring a contemporary story of love and romance set in an exotic locale. Regular readers know that there will be no explicit sex or violence and that every book has a happy ending.

For many years, Simon & Schuster was the exclusive United States distributor of the Harlequin Presents series and other books published by Harlequin. In early 1979, however, Harlequin notified Simon & Schuster that it planned to let the distributorship agreement expire by its terms and, beginning January 1, 1980, to conduct its own distribution in the United States.

Shortly thereafter, Simon & Schuster decided to launch its own line of romance fiction under the rubric "Silhouette Romance." In March, 1980, approximately one month before the Silhouette Romance series appeared on the market, Harlequin filed a trade dress infringement suit alleging that the Silhouette Romance cover design is virtually identical to that of the Harlequin Presents series. On July 3, 1980, Harlequin moved for preliminary relief against the use of the Silhouette Romance cover.

Finding that romance readers were likely to be confused between the two covers and that the Harlequin Presents cover has secondary meaning, the district court granted Harlequin relief. Simon & Schuster was enjoined from publishing any further books

with the infringing cover, but was not required to recall or cease selling books already published. The district court also held that laches on Harlequin's part, even if proved, did not bar preliminary relief since it appeared that Simon & Schuster deliberately copied the Harlequin Presents cover.

## II.

On the undisputed facts in the record before us, we hold that the district court did not abuse its discretion in enjoining Simon & Schuster from further use of the Silhouette Romance cover.

The district court's conclusion that the Silhouette Romance cover is "substantially similar" to the Harlequin Presents cover is clearly supported by the evidence. Both books are bound with glossy white covers and are of identical dimensions in height, width and thickness. The series' number is set in black type in the upper left hand corner and the price is printed on the upper right hand corner of each book. Both books retail for $1.50. A collage of gold filigree, the publisher's colophon and the series' title appears in the top center of each cover. Harlequin's colophon, a black and white harlequin, is framed by a gold diamond; Simon & Schuster's colophon, black silhouettes of a man and woman, is cast in a gold oval. The series' titles are printed in similar black script with one word of the series' title appearing on each side of the colophon. Beneath the collage on each book, the author's name is printed in bold, colored capital letters. The book's title is printed below the author's name on both books in black lettering. The bottom half of each cover is devoted to an illustration of a man and a woman in a romantic setting suggesting the book's story line.

While there are also some differences, such as the series' names and the publishers' colophons, it is the "combination of features as a whole rather than a differ-

ence in some of the details which must determine whether the competing product is likely to cause confusion in the mind of the public." *Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d 950, 955 (2d Cir. 1980). We, like the district court, are convinced that an ordinary buyer of romance fiction would not recognize the disparities without setting out to find them. A buyer who did notice the difference between the names and the colophons would be reasonably justified in believing both products come from the same publisher.

In addition to the startling similarities between the covers, the district judge determined that there was actual confusion between the two covers among romance readers and members of the trade. These findings are substantiated by the inquiries directed to Harlequin about the Silhouette Romance series and the extraordinary number of Silhouette Romance book returns sent to Harlequin by retailers. Finally, the district court received and credited substantial evidence that Simon & Schuster deliberately imitated the Harlequin Presents cover. Evidence of conscious imitation is pertinent because the law presumes that an intended similarity is likely to cause confusion. *Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 618 F.2d at 954; *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, 1060 (2d Cir. 1979); *Harold Ritchie, Inc. v. Chesebrough-Pond's, Inc.*, 281 F.2d 755, 758–60 (2d Cir. 1960).

Harlequin has also adduced sufficient evidence to support the district court's preliminary finding that the Harlequin Presents cover has a "secondary meaning" for romance readers. By secondary meaning, we mean that romance readers associate the Harlequin Presents cover with a particular series and publisher. *See RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d at 1059. Harlequin's extensive national advertising, its phenomenal sales success[1] and

---

1. In 1979, more than 20 million Harlequin Presents books were sold in the United States alone.

the results of a consumer survey[2] indicate that romance readers correlate the Harlequin Presents cover with Harlequin and the Harlequin Presents series. *See id.* at 1060. The fact that the enthusiasm and loyalty of Harlequin's readers have been the subject of extensive, unsolicited media coverage further supports the district court's finding of secondary meaning. *Scarves By Vera, Inc. v. Todo Imports, Ltd.,* 544 F.2d 1167, 1174 (2d Cir. 1976). Perhaps the most significant evidence of secondary meaning in this case, however, was the attempt by Simon & Schuster to capitalize on the Harlequin Presents cover when it introduced its own romance series. *RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d at 1060.

 Although secondary meaning usually is a prerequisite to trademark protection, New York law shields trade dress from deliberate copying even if it has not acquired a secondary meaning. *Perfect Fit Industries, Inc. v. Acme Quilting Co.,* 618 F.2d 950 (2d Cir. 1980). Thus, even if romance readers did not associate the Harlequin Presents cover with a specific series and publisher, Harlequin would be entitled to an injunction against Simon & Schuster's deliberate imitation of its cover.

We also agree that Harlequin's delay in seeking a preliminary injunction does not bar relief, because there is no evidence of laches. Simon & Schuster certainly cannot claim that Harlequin acquiesced in the use of the infringing covers since Harlequin had instituted an infringement action against Simon & Schuster well before the Silhouette Romance series was placed on the market. Although Harlequin did not apply for injunctive relief until three months after the series appeared, much of the delay was caused by conferences of counsel and defendant's insistence that Harlequin should retain different counsel, which it did.

Furthermore, laches is not a defense against injunctive relief when the defendant intended the infringement. 4 R. Callman, Unfair Competition, Trademarks and Monopolies ¶ 87.3(b)(2) (3 ed. 1970). In any event, the relief granted by Judge Owen took into consideration Harlequin's delay in seeking preliminary relief. By the district court order of September 5, 1980, Simon & Schuster was permitted to continue selling books already published with the infringing cover.

The findings of the district court and terms of its preliminary injunction are amply supported by the record.

Affirmed.

---

2. Spencer Bruno Research Associates interviewed 500 romance readers in three cities. The readers were shown copies of unpublished Harlequin Presents titles with the Harlequin name and colophon deleted and asked to name the publisher. Fifty percent of the readers correctly identified Harlequin as the publisher.

While these results are not conclusive evidence of secondary meaning, particularly in light of Harlequin's market dominance, the district court properly found the results probative of secondary meaning. *RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058, 1060 (2d Cir. 1979).