**CICENA LTD. and Cicena, Inc.,**
**Plaintiffs–Appellees,**

**v.**

**COLUMBIA TELECOMMUNICATIONS GROUP, Defendant–Appellant.**

**No. 90–1053.**

United States Court of Appeals,
Federal Circuit.

April 3, 1990.

---

Richard Z. Lehv, Zelnick & Lehrman, P.C., New York City, argued for plaintiffs-appellees. With him on the brief were Weiss Dawid Fross, Allan Zelnick, Stephen F. Mohr & Glenn Mitchell.

William J. Thomashower, Kaplan, Thomashower & Landau, of New York City, argued for defendant-appellant. With him on the brief was Mark Landau and Eugenia S. Nathanson.

Before RICH and MICHEL, Circuit Judges, and SKELTON, Senior Circuit Judge.

RICH, Circuit Judge.

Columbia Telecommunications Group (CTG) appeals from the September 27, 1989 order of the District Court for the Southern District of New York, Civil Action No. 89 Civ. 6078, preliminarily enjoining CTG from infringing the trade dress of Cicena Ltd.'s and Cicena, Inc.'s (collectively Cicena's) clear plastic neon-lit telephone pursuant to section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). We vacate and remand.

## BACKGROUND

This lawsuit centers around both parties' manufacture and sale of clear plastic neon-lit telephones. Cicena began making its telephone, which it calls the "ROXANNE," in January of 1988. The ROXANNE telephone is similar in shape to the common desk telephone, although of a lower profile, flattened "wedge" shape. The base and handset casings are made of transparent colorless plastic. The internal mechanisms of the telephone are therefore visible, including a printed circuit board, with all its components, which are painted white. Also within the housing is a U-shaped neon tube which extends around the sides and front inside the base of the telephone and, when lit, illuminates the interior and surrounding area with a colored light and flashes when a call is received. It is a novelty or "conversation piece" type of consumer equipment.

Cicena sells the ROXANNE telephone through both large retailers and mail-order catalogs. Cicena's marketing of the ROXANNE telephone was an instant success, with 40,000 telephones sold in 1988 and a projected 60,000 telephones to be sold in 1989. Cicena spent approximately $360,000 on advertising and promotion in 1988 and expected to exceed $1,000,000 in advertising and promotion in 1989. The telephone also received publicity through its appearance on MTV, a national cable music video network, and television shows such as the McNeil–Lehrer News Hour and Good Morning America. It sold at retail at $200 or more.

CTG has, since 1983, been making various "novelty" telephones, such as a piano-shaped telephone, one shaped like a woman's shoe and animal-shaped telephones. CTG developed its clear plastic neon-lit telephone, the NE587, in 1989. It is similar to the ROXANNE but with distinct differences. Like the ROXANNE, the NE587 resembles the basic "wedge-shaped" desk telephone, and has a clear plastic housing so that the components, including a printed circuit board painted blue or pink, can be seen from the outside. An internal neon tube like that in the ROXANNE extends around three sides of the base and blinks when a call is received.

The main differences between the NE587 and ROXANNE are: The housings and handsets are of clearly different shapes. The keypad on the ROXANNE is a plain white, black lettered, conventional deskset touchtone keypad (12 square keys numbers 0–9 plus a * key and a # key), while the keypad of the NE587 has keys of distinctly different, low profile, horizontal oblong shape with rounded edges and distinctive alpha-numeric design, as well as additional function keys such as hold, redial, on-off for the ringer, and bright-soft for the neon light. The keys are colored. The keypad plate of the NE587 is white, the keys are

larger than those of ROXANNE, and the circuit board inside the base and keys are in matching colors. In sum, the ROXANNE and NE587 do not look alike and the average purchaser could, therefore, readily distinguish them.

CTG's president, Mr. David Giladi, was aware of the ROXANNE telephone as well as other see-through neon-lit telephones when, in late 1988 and early 1989, he began discussions with a manufacturer in Taiwan concerning the possibility of making a clear plastic neon-lit telephone. After several such discussions in which Mr. Giladi explained to his Taiwanese manufacturer the type of telephone he wanted, the Taiwanese manufacturer on February 26, 1989 provided Mr. Giladi with drawings which would serve as the basis for making the NE587 telephone. In early April, 1989, CTG received a model of the NE587 from the Taiwanese manufacturer. Later in April, 1989, CTG sent two ROXANNE telephones to the Taiwanese manufacturer, although it does not appear that the existing design of the NE587 changed significantly after their receipt. CTG's NE587 telephone was publicly displayed at a trade show in June of 1989, although it is unclear from the record before us on what date, if any, the NE587 was first actually sold.

Cicena brought suit on September 14, 1989, based on theories of unfair competition under both New York state law and § 43(a) of the Lanham Act (15 U.S.C. § 1125(a)), as well as design patent infringement of U.S. Pat. No. D 300,134 (thus giving us jurisdiction over this appeal). Cicena sought a preliminary injunction, and a two day hearing was held on September 21 and 22, 1989, at the conclusion of which the injunction was granted orally. September 27, 1989, the district judge signed a preliminary injunction order based solely on § 43(a), while refusing to reach the issues of design patent infringement and state law unfair competition. In the opinion given orally from the bench, the district judge found that while the balance of hardships did not weigh decidedly in Cicena's favor, they had shown both irreparable harm and a likelihood of success on the merits. CTG appeals.

## OPINION

### A. Standard of Review and Applicable Law

When dealing with issues of unfair competition law, over which this court does not have exclusive appellate jurisdiction, we look to the law of the regional circuit where the district court sits, here the Second Circuit. *Windsurfing International Inc. v. AMF Inc.*, 828 F.2d 755, 757, 4 USPQ2d 1052, 1054 (Fed.Cir.1987). Under Second Circuit law, the decision to issue a preliminary injunction is reviewed under an abuse of discretion standard, meaning that we must affirm the district court unless we find the court relied on clearly erroneous findings of fact or on an error of law. *Cliffs Notes, Inc. v. Bantam Doubleday Dell Publishing Group, Inc.*, 886 F.2d 490, 493, 12 USPQ2d 1289, 1291 (2d Cir.1989). Failure to consider relevant factors or to apply the proper standards constitutes an error of law. *Stormy Clime Ltd. v. Progroup, Inc.*, 809 F.2d 971, 973–74, 1 USPQ2d 2026, 2028 (2d Cir.1987).

In the Second Circuit, a party seeking a preliminary injunction must establish

> both possible irreparable injury and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.

*LeSportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 74, 225 USPQ 654, 656 (2d Cir.1985). Because the district judge specifically found that the balance of hardships was *not* decidedly in Cicena's favor, a finding not contested here, Cicena must meet the higher "likelihood of success" burden rather than the "serious questions" standard.

### B. Secondary Meaning

In a trade dress infringement suit under § 43(a) of the Lanham Act, the Second Circuit requires the plaintiff to establish that his trade dress has acquired secondary meaning. *Stormy Clime*, 809 F.2d at 974, 1 USPQ2d at 2028. This requirement fol-

lows naturally from the language of § 43(a), which offers redress for "false designation of origin." 15 U.S.C. § 1125(a) (Supp. V, 1987).[1] If the plaintiff cannot show that his trade dress has acquired secondary meaning, i.e. that "the purchasing public associates that dress with a single producer or source rather than just with the product itself,"[2] then use of that trade dress by a competitor will not designate *any* origin and there is no violation of § 43(a).

The district court did not explicitly make a finding of secondary meaning, but instead found "at least ... secondary meaning in the making," citing *Jolly Good Industries Inc. v. Elegra Inc.*, 690 F.Supp. 227, 9 USPQ2d 1534 (S.D.N.Y.1988). The doctrine of "secondary meaning in the making" is generally credited to have begun with the case of *The National Lampoon, Inc. v. American Broadcasting Cos., Inc.*, 376 F.Supp. 733, 182 USPQ 24 (S.D.N.Y.), *aff'd on other grounds*, 497 F.2d 1343, 182 USPQ 6 (2d Cir.1974), in which the trial court cited the following passage from 3 Callman, *Unfair Competition, Trademarks and Monopolies* (3d ed. 1971) p. 356:

> A mark with secondary meaning in-the-making should also be protected, at least against those who appropriate it with knowledge or good reason to know of its potential in that regard, or with an intent to capitalize on its goodwill.... "Piracy should no more be tolerated in the earlier stages of development of good will than in the later." (citations omitted)

Later cases have refined the doctrine as follows:

> [A] Lanham Act claim may be based on the theory that, where secondary meaning is "in the making" but not yet fully

developed, a trademark or trade dress will be protected against intentional, deliberate attempts to capitalize on a distinctive product.

*Metro Kane Imports, Ltd. v. Federated Department Stores, Inc.*, 625 F.Supp. 313, 316, 228 USPQ 761, 762 (S.D.N.Y.1985), *aff'd without opinion sub nom. Metro Kane Imports, Ltd. v. Brookstone Co.*, 800 F.2d 1128 (2d Cir.1986); *see also Jolly Good*, 690 F.Supp. at 230, 9 USPQ2d at 1537. The purpose of the doctrine of secondary meaning in the making is to protect a plaintiff who has spent and is spending money and effort to create secondary meaning in a product, but has not yet succeeded, from others who try to profit from whatever goodwill the plaintiff has built up. *Id.*

However, the doctrine of secondary meaning in the making is of questionable validity. At least one circuit has explicitly rejected the doctrine,[3] and we know of no courts other than the New York District Courts which have endorsed it. Furthermore, the discussions of the doctrine in the majority of the New York cases are dicta, since either secondary meaning was also found or the facts were insufficient to support even secondary meaning in the making. *See PAF S.r.l. v. Lisa Lighting Co.*, 712 F.Supp. 394, 12 USPQ2d 1161 (S.D.N.Y.1989); *L.A. Gear Inc. v. Thom McAn Shoe Co.*, 12 USPQ2d 1001 (S.D.N.Y.1989); *Elizabeth Taylor Cosmetics Co. Inc. v. Annick Goutal S.A.R.L.*, 673 F.Supp. 1238, 5 USPQ2d 1305 (S.D.N.Y.1987); *Centaur Communications Ltd. v. A/S/M Communications Inc.*, 652 F.Supp. 1105, 1 USPQ2d 1958 (S.D.N.Y.), *aff'd*, 830 F.2d 1217, 4 USPQ2d 1541 (2d Cir.1987); *Scholastic Inc. v. Macmillan Inc.*, 650 F.Supp. 866, 2 USPQ2d 1191 (S.D.N.Y.1987); *Metro*

---

1. § 43(a) was substantially amended by the Trademark Law Revision Act of 1988. See 15 U.S.C. § 1125 (1988). However, because those changes were not to become effective until November 16, 1989, they are not relevant to this appeal based on an injunction entered September 17, 1989. Therefore, references to "§ 43(a)" in this opinion are to the pre–1988 version.

2. *LeSportsac*, 754 F.2d at 78, 225 USPQ at 659; *see also Inwood Laboratories, Inc. v. Ives Labor-*

atories, *Inc.*, 456 U.S. 844, 851, 102 S.Ct. 2182, 2187, 72 L.Ed.2d 606 (1982).

3. *See Black & Decker Mfg. Co. v. Ever–Ready Appliance Mfg. Co.*, 684 F.2d 546, 215 USPQ 97 (8th Cir.1982); *see also A.J. Canfield Co. v. Concord Beverage Co.*, 629 F.Supp. 200, 228 USPQ 479 (E.D.Pa.1985), *aff'd in part, A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 1 USPQ2d 1364 (3rd Cir.1986).

*Kane Imports,* 625 F.Supp. 313, 228 USPQ 761; *Loctite Corp. v. National Starch and Chemical Corp.,* 516 F.Supp. 190, 211 USPQ 237 (S.D.N.Y.1981); *Orion Pictures Co., Inc. v. Dell Publishing Co., Inc.,* 471 F.Supp. 392, 202 USPQ 819 (S.D.N.Y.1979); *Nature's Bounty, Inc. v. Basic Organics,* 432 F.Supp. 546, 196 USPQ 622 (E.D.N.Y. 1977); *The National Lampoon,* 376 F.Supp. 733, 182 USPQ 24. In fact, the only case of which we are aware in which the doctrine of secondary meaning in the making was necessary to the decision is *Jolly Good.*

■ The Second Circuit has had several opportunities to discuss the doctrine, but has not done so. *See, e.g. Metro Kane Imports, Ltd. v. Brookstone Co.,* 800 F.2d 1128 (2d Cir.1986); *The National Lampoon, Inc. v. American Broadcasting Cos., Inc.,* 497 F.2d 1343, 182 USPQ 6 (2d Cir.1974) (one paragraph per curiam opinion affirming on other grounds). Therefore we are in the delicate position of deciding a question of first impression in the Second Circuit, trusting that it will agree. After considerable study of the matter, we are of the opinion that the Second Circuit, if faced with the question, would reject the doctrine of secondary meaning in the making.

Our primary basis for reaching this conclusion rests in the language of § 43(a) which, in the area of trademark and trade dress law, protects only against "false designation of origin." 15 U.S.C. § 1125.[4] A

trademark or trade dress which lacks secondary meaning, i.e., does not associate the product with a single source, by definition does not designate origin.[5] To allow a plaintiff to succeed on a theory of secondary meaning in the making would undermine the entire purpose of the secondary meaning requirement: to show that the public associates the product with a source rather than with the product itself.

■ We quote with approval the following passage from an Eighth Circuit opinion:

[Secondary meaning in the making] focuses solely upon the intent and actions of the seller of the product to the exclusion of the consuming public; but the very essence of secondary meaning is the association in the mind of the public of particular aspects of trade dress with a particular product and producer.

*Black & Decker,* 684 F.2d at 550, 215 USPQ at 100.[6] While the doctrine of secondary meaning in the making may serve an admirable goal—that of preventing the deliberate copier from capitalizing on the efforts of the first producer—such a goal is not encompassed by § 43(a) of the Lanham Act.[7] Instead, protection from such activity must be found in other more general unfair competition laws, such as New York state unfair competition law.[8] Thus, the district court erred as a matter of law in basing the injunction on a finding of secondary meaning in the making, since that finding, even if correct, is insufficient to support a claim under § 43(a).

4. We are aware that § 43(a) also protects a manufacturer from "any false description or representation." 15 U.S.C. § 1125(a). However, case law has limited trademark and trade dress protection to protection only against "false designation of origin." *See, e.g. LeSportsac,* 754 F.2d at 75, 225 USPQ at 656.

5. Of course in the area of *trademarks,* a mark which is suggestive or arbitrary need not be shown to have acquired secondary meaning to be protectable under § 43(a) because such a mark is considered to be inherently distinctive and thus presumed to designate origin. However, by requiring a finding of secondary meaning in *trade dress* cases under § 43(a), the Second Circuit has implicitly rejected the idea that a trade dress can be inherently distinctive and thus not require a showing of secondary meaning.

6. Precedent in the Second Circuit also indicates that the focus of secondary meaning is the consuming public. *Centaur Communications Ltd. v. A/S/M Communications Inc.,* 830 F.2d 1217, 1221, 4 USPQ2d 1541, 1544 (2d Cir.1987).

7. It is possible that the substantial amendments made to § 43(a) by the Trademark Law Revision Act of 1988 changed the scope of protection of § 43(a). However, those amendments are not relevant to this appeal. See note 1, *supra.*

8. Under the so-called "New York Rule," in a claim for unfair competition based on New York common law, proof of secondary meaning may not be necessary when deliberate copying is shown. *See Jolly Good,* 690 F.Supp. at 233, 9 USPQ2d at 1539.

Cicena argues that while the district court did not specifically find secondary meaning, that such a finding can be inferred from other statements in the judge's bench ruling. In particular, Cicena points to the following:

It seems to me quite clear that it's more probable than not that a casual viewer of television programs, who saw the program that we saw here and was inspired thereby to buy one of these remarkable telephones, and went to say Macy's and found defendant's product on display, would very likely think he or she was seeing the same thing as he or she had seen on the television, and defendant would be getting the benefit of plaintiff's advertising which seems to me the essence of what isn't supposed to happen.

We do not find this statement sufficient to infer secondary meaning. First, this statement was made in support of the judge's finding of secondary meaning in the making, where the primary focus is on the efforts of the defendant to copy the plaintiff's product; there is no indication that the judge considered elements relevant to secondary meaning besides copying, such as advertising expenditures, sales success, length and exclusivity of use, unsolicited media coverage, and consumer studies. "Proof of secondary meaning entails vigorous evidentiary requirements." *Thompson Medical Co., Inc. v. Pfizer Inc.*, 753 F.2d 208, 217, 225 USPQ 124, 131 (2d Cir.1985).

Secondly, other statements made by the district judge in his bench opinion infer a lack of secondary meaning. The judge found that

a person doesn't buy this phone rather than another phone because he thinks he's getting a more reliable phone because it's made by a more reliable manufacturer.

We agree with this statement and with the district judge's comment earlier in the proceeding that consumers "want this phone because it looks like that. They don't give a damn who made it." While these consid-

erations would not preclude a finding of secondary meaning (since the determining factor is one of consumer association of a product with a source, not consumer motivation), they do lead away from a finding that Cicena's telephone design serves any source-identifying function.

In fact, we do not find the evidence before the district court to be sufficient to support a finding of likelihood of success on the secondary meaning issue. Certainly the ROXANNE telephone has been a commercial success and Cicena has spent a significant amount in advertising. The ROXANNE has also received some unsolicited media coverage. However, sales success is not necessarily indicative of secondary meaning, but can be attributed to many other factors—the most likely being that, in the public's eye, the ROXANNE is an aesthetically pleasing, desirable-looking telephone. For the same reason, we do not consider this to be a case in which the media coverage shows the "enthusiasm and loyalty" of plaintiff's customers.[9] And while sales success, advertising expenditures and media coverage can be circumstantial evidence that consumers have been so exposed to a trade dress that they associate it with a single manufacturer,[10] we do not consider the sales and advertising numbers involved here to be so large as to be particularly probative circumstantial evidence. This is especially true in view of the limited time which the ROXANNE telephone has had to develop secondary meaning—only approximately eighteen months.

As to the factor of intentional copying, the district court's findings are somewhat confusing. The district court did find that in April of 1989, CTG sent the two ROXANNE telephones to its Taiwanese manufacturer for the purpose of "having them influence the design" of the NE587. However, from the evidence in this case, it does not appear that those two telephones did, in fact, influence the design of the NE587. The drawings and specifications for the NE587 prepared by CTG's Taiwanese man-

**9.** *See Harlequin Enterprises Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 950, 210 USPQ 1, 3 (2d Cir.1981).

**10.** *See* 1 McCarthy, *Trademarks and Unfair Competition* (2d ed. 1984) § 15:16.

ufacturer in February of 1989 show and describe a telephone in almost all respects identical to what became the final product.

 The district court also found that it was

> more probable than not that defendant wasn't just trying to get into the electronic phone business, but was trying to benefit from the precise market that the plaintiff had established.

Attempting to capitalize on a market demand for a type of product does not always indicate secondary meaning. In a case such as *Harlequin Enterprises Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 210 USPQ 1 (2d Cir.1981), where the plaintiff's book covers have no intrinsic appeal of their own, it is clear that the only reason the defendant chose to copy those book covers was because of the secondary meaning present in them. However, in the present case, a see-through, neon-lit telephone generally like the ROXANNE has some intrinsic consumer-desirability, as evidenced by its immediate sales success. CTG's entry into the market for see-through neon-lit telephones was more likely based on an effort to capitalize on that intrinsic consumer-desirability than on any alleged secondary meaning developed by Cicena.[11]

Other evidence points strongly away from a finding of secondary meaning. First is the limited time that the ROXANNE has been on the market; only about eighteen months. Second is the existence of other similar telephone designs which compete with the ROXANNE design. Since at least 1986, a company called Loys has been making a clear plastic desk telephone with a U-shaped neon tube extending around three sides of the base. While there are significant differences between the Loys telephone and the ROXANNE, the existence of other see-through neon-lit telephones on the market makes it less

likely that consumers will associate such phones with a single manufacturer.

These factors, coupled with the complete absence of any consumer studies linking the ROXANNE design with a source, leads us to the conclusion that there is insufficient evidence in the present record to support a finding of secondary meaning. We find the situation here to be very similar to that in the *Stormy Clime* case in which the Second Circuit vacated a preliminary injunction and we are doing so here for many of the same reasons stated in that opinion.

### C. *Conclusion*

Since Cicena has failed to present sufficient evidence to support a finding of likelihood of success on the issue of secondary meaning, we vacate the preliminary injunction on this ground, and do not reach the remaining issues raised by CTG concerning irreparable harm, functionality, and likelihood of confusion. Likewise, we cannot consider Cicena's argument that the injunction could be upheld on the basis of New York state unfair competition law because the district court specifically did not reach this ground and the issue is not before us.

### COSTS

Cicena shall bear the costs.

**VACATED AND REMANDED.**

---

11. As support for this conclusion, we point (1) to the district court's astute observation during the proceeding: consumers "want this phone because it looks like that. They don't give a damn who made it;" and (2) to the fact that although the NE587 is similar to the ROXANNE simply because they are both desk-type telephones, both transparent, and both neon-lighted, there are many differences in their shapes, the appearance and structures of their keyboards, and the colors in the internal components.